## LEWIS *v.* J. A.

In a dealing between solicitor and client involving the property of the latter, the former must place himself in the position of a stranger. He must be able to show that he has cut off, as it were, the connection which bound him to the client; that they have dealt at arms-length; and that nothing has happened which might not have happened had no such connection existed.

Equity interferes to help a client against the effect of a dealing with his lawyer on other ground than fraud. It is done from the fact of there being an inequality arising from confidence on the part of the client.

A solicitor, who had been long employed by a client, was applied to for the purpose of finding security for money. At first he was not successful; but, afterwards, he suggested having of his own properties, certain " very excellent" bonds and mortgages, but did not describe them or give the names of the mortgagors; and the client, at once, sent word that he could have the money. Whereupon, the solicitor sent his clerk with the bonds and mortgages and assignments thereof duly acknowledged; and the client gave his check. The latter, for some time, received the interest on them. The mortgagors in one or more of the cases had conveyed away the premises, subject to the mortgages. This was particularly the case as to one, where the interest was in arrear at the time the client received them and the mortgagor was insolvent soon afterwards. The property in this particular mortgage consisted of vacant lots and the ultimate holders at last refused to pay any more interest; and taxes and assessments came in arrear. No fraud was proved. The transaction occurred in February 1838 and the bill for relief was filed in May 1842. *Held*, that the solicitor was bound to take back this bond and mortgage and restore the amount paid for it, with interest, and reimburse prospective payments for taxes and assessments.

THIS case involved a matter of professional confidence and liability, arising from the fact of advance of money, by way of investment, on the assignment of bonds and mortgages by a solicitor to his client.

The decision of the court embraces the circumstances sufficiently.

*Nov.* 13, 14, 15, 16, 20, 1844.

*Solicitor and Client.*

Mr. *B. F. Butler*, for the complainant.

Mr. *M. Hoffman*, for the defendant.

THE VICE-CHANCELLOR :—The bill, with the admissions in the answer and the proofs in the cause, present the fol-

*Sept.* 9, 1845.

lowing among other facts :—That, in the year one thousand eight hundred and thirty-seven and for more than twenty years prior thereto, the complainant was personally and familiarly known to the defendant, who had been employed by him in his professional capacity as attorney, solicitor and counsel whenever the complainant required legal advice and assistance in the prosecution and defence of suits and in putting out money on bond and mortgage. The complainant was, moreover, in the habit of consulting him confidentially about other matters, not strictly within the line of professional business ; and the defendant frequently gave him advice about pecuniary affairs without charge. In the years one thousand eight hundred and thirty-three and one thousand eight hundred and thirty-four, the complainant was absent in Europe ; and, during his absence, the defendant held his power of attorney and, as his agent, superintended his affairs without compensation. All this inspired the complainant with gratitude ; and, from their long intercourse and intimacy of a friendly and professional character, the defendant had acquired—very deservedly so—the complainant's unbounded confidence in his personal integrity, professional ability and experience in business, including the investment of money on security of real estate in the city of New York. In the latter part of the year one thousand eight hundred and thirty-seven the complainant had considerable money on hand, which he wished to invest, with a view to obtain a regular and permanent income therefrom ; and he, then again, employed the defendant in his professional capacity to assist him in procuring its investment in good bonds and mortgages upon improved, productive and unincumbered real estate in the city of New York ; and which employment the defendant accepted and acted under. In the course of the residue of that year and during the year one thousand eight hundred and thirty-eight the defendant sent in various applications made to him for loans, all of which the complainant rejected as not being satisfactory ; and this was done with the knowledge of the defendant, who thereby became aware of the complainant's extreme caution about security and of his determination not to let his money go, except upon security of the most un-

1844.

LEWIS
v.
J. A.

questionable character—he preferring that his money should rather remain idle than be put out upon such property as should be deemed at all doubtful or troublesome. In consequence of the failure of so many of his applications, the defendant, at length, omitted to send him any more; and ceased to give himself any further concern about investments, although it would seem that the complainant still considered him employed for such purpose and that the defendant had not actually withdrawn from it as late as the month of October one thousand eight hundred and thirty-eight : for it is alleged that, about this time, the sum particularly named to the defendant in respect to which his employment related was twelve thousand dollars—and to this the defendant in his answer says and admits that, at some time pending their efforts to invest the funds, but when particularly he cannot say, he did ascertain the amount to be twelve thousand dollars or thereabouts.

On the twenty-seventh of November, one thousand eight hundred and thirty-eight, the defendant had purchased property in the country ; and being in need of money to pay for it, addressed a note in writing to the complainant, inquiring whether he still had on hand the twelve thousand dollars and saying that he, the defendant, had " some very excellent mortgages which he should like to assign to him for that sum" ?  The complainant replied, in effect, that he still had the money on hand and that it was at the defendant's service whenever he should choose to send for it and that he could make the sum twelve thousand five hundred dollars.

Accordingly, on the sixth of December one thousand eight hundred and thirty-eight, the defendant sent his clerk to the complainant, with five bonds and mortgages and an assignment of each, already executed, and a statement of the amounts in the aggregate, being a little over thirteen thousand dollars and requested his check for the whole sum. On looking at this statement, the complainant remarked that the amount exceeded the sum he had on hand, whereupon the defendant's clerk withdrew one of the bonds and its accompanying mortgage from the parcel, being the smallest of the five ; and the remaining four, amounting to twelve thousand two hundred and seven dollars and thirty-nine cents,

were, on the instant, taken by the complainant and he gave his check therefor. Until that moment, the complainant had never seen the bonds and mortgages; and knew nothing of the mortgagors or the value, condition or location of the property mortgaged. And while he did not stop to examine them before he gave his check, all the information he received of those particulars was from the defendant's clerk as he handed over the papers who told him that the Harris bond and mortgage (being one of the number) was on property in McDougall street, that Messrs. Herricks, flour merchants, who were wealthy men, were the owners and that they paid the interest, that another called the Wentworth bond and mortgage was on property in Bond street and that Wentworth was a builder, that the next was the Bogert bond and mortgage on property in Spring street and the owner was a very punctual man in the payment of the interest; and that another was the McVicar bond and mortgage, which was a security on lots at Chelsea. That Dr. McVicar was a professor in Columbia College and that he had sold the property to Henry J. Seaman, a merchant in Pearl street. This information was volunteered and not elicited by any inquiries made by the complainant.

It further appears that, in sending the papers in the manner before stated, the defendant did not propose or offer to submit the papers for examination or to give time or opportunity for the complainant to obtain information from other sources as to the sufficiency or value of the securities before closing the bargain; and that all that the defendant did was to write a note to the complainant, by his clerk, saying "William will hand you assignments of mortgages, with a memorandum, showing the amount due on each. Give him your check for the amount. The assignments are all acknowledged, but you need not record them. This must be done whenever any of them are paid off." The assignments contained no covenant or guaranty. The McVickar bond and mortgage so called had been taken by the defendant on the thirty-first day of December one thousand eight hundred and thirty-six on two lots of ground, one fronting on Nineteenth street and the other on Twentieth street, to secure the payment of three thousand five hundred dollars, with inte-

1844.

LEWIS
v
J. A.

rest. On the bond was a memorandum made by the defendant, stating that the interest was paid upon it to the thirtieth day of June one thousand eight hundred and thirty-eight and, from that period, the interest was computed and added to the principal, making, together, three thousand six hundred and six dollars and fourteen cents—and that being the consideration paid for the assignment of this bond and mortgage.

In taking the bonds and mortgages and parting with his money in the manner described, the complainant believed he was obtaining ample security, not only for the principal but for the punctual payment of the interest as it should become due and that the property, in each instance, was of sufficient value to afford that security and not affected by unpaid taxes or assessments so as to interfere with the first lien of the mortgages, and that each bond was the bond of a solvent and punctual obligor in respect to the payment of interest and, so far as the property was in the hands of subsequent purchasers, that they punctually paid and would continue to pay the interest. All this belief was induced by the confidence he had been led to repose in the defendant and more especially by the representation made in respect to the excellence of the securities.

The fact is also apparent that the defendant expected the complainant would take the bonds and mortgages and furnish the money immediately, without stopping to make inquiries or to seek for information elsewhere concerning their value and sufficiency; and that he would be governed entirely by his confidence in the defendant and by a desire to meet his wishes and not be governed by any independent judgment of his own or actual knowledge of the character of the securities.

It then appears, with respect to the McVicar bond and mortgage, (and about which the controversy has arisen) that when the half year's interest became due after the assignment, the complainant ascertained that Anderson and Richards held the title to the lots under a conveyance from Seaman the mortgagor's grantee. On being called on, they paid him the interest on the bond; and continued to pay the interest from time to time down to the first day of April one

thousand eight hundred and forty. But after that, they refused to pay any more, because the lots were unproductive and not of sufficient value to justify them in doing so.

Failing to obtain payment of the interest any longer from that quarter, the complainant sought Mr. McVickar, who stated to him the fact of his having parted with the property, subject to the mortgage, and that his personal security, if looked to, was not available; that he did not hold himself bound, but, if bound, it was no security.

He also ascertained that the lots were at that time (April 1840) of insufficient value to satisfy the mortgage debt and that taxes had been suffered to get in arrear and remained unpaid: and also that there were some assessments, under corporation ordinances, which had not been paid and for which the property was liable.

Under these circumstances, the complainant applied to the defendant to take back the bond and mortgage and refund the money and the interest due thereon, which the defendant declined doing. The complainant then offered to put the bond and mortgage in suit against the land and against the persons who might be liable for the debt, provided the defendant would consent it should not prejudice any claim he might have upon the defendant; but the defendant refused to make any such arrangement.

The complainant has, therefore, filed his bill to have the money which he paid upon the assignment of the McVickar bond and mortgage restored, with interest; and be reimbursed such sums as he has since paid for taxes and assessments on the mortgaged property—the complainant being ready and willing and offering by his bill to reassign the bond and mortgage to the defendant.

The bill was filed for this purpose on the thirty-first day of May one thousand eight hundred and forty-two; and, since filing it, the complainant has advanced other sums by consent and without prejudice for other taxes, &c.

From the foregoing statement it will be perceived that the complainant seeks to be relieved from the bond and mortgage in question; not on the ground of any intentional fraud practised upon him (for fraudulent motive or design in the transaction has not been imputed and is not imputable to

the defendant) but, upon a ground equally efficacious for rescinding the contract in the view of a court of equity, where the facts will warrant it.   And that is, that the parties stood in the relation of solicitor or counsel and client towards each other ; and, owing to such relation, that they dealt in the matter of the bonds and mortgages assigned by the defendant upon unequal terms—one reposing entire confidence in the other and exercising no judgment of his own in respect to the value, sufficiency or goodness of the securities. It is obvious, says Judge Story, " that the relation of client and attorney or solicitor must give rise to great confidence between the parties and to very strong influences over the actions and rights and interests of the client.   The situation of an attorney or solicitor puts it in his power to avail himself not only of the necessities of his client but of his good nature, liberality and credulity to obtain undue advantages, bargains and gratuities.   Hence the law, with a wise providence, not only watches over all the transactions of parties in this predicament but it often interposes to declare transactions void which, between other parties, would be held unobjectionable.   This it does, not so much on account of hardship in the particular case as for the sake of preventing what might otherwise become a public mischief."   He goes on to say, "it is not necessary to establish that there has been fraud or imposition on the client.   On the other hand it is not necessarily void throughout *ipso facto*.   But the burthen of establishing its perfect fairness, adequacy and equity is thrown upon the attorney : upon the general rule that he who bargains in a matter of advantage with a person placing confidence in him is bound to show that a reasonable use has been made of that confidence" : Story's Com. sec. 308 to 312.

The doctrine thus laid down is found in a great number of well adjudged cases ; and nowhere is it more clearly shown than by Lord Brougham in *Hunter* v. *Atkins*, 3 Myl. & K. 11 and by V. C. Hoffman in *Berrien* v. *McLane*, 1 Hoff. R. 421.

Lord Brougham's remarks are to this effect : that an attorney, dealing with his client, takes upon himself the burthen of proving that he has dealt exactly as a stranger would

have done; taking no advantage of his influence or know-ledge; putting the client on his guard; and bringing every thing to the client's knowledge which he himself knew. In other words, the attorney must show that he has placed him-self in the position of a stranger; that he has cut off, as it were, the connection which bound him to the client; that they have dealt at arms-length; and that nothing has hap-pened which might not have happened had no such connec-tion existed. This doctrine seems to me to apply, in all its length and breadth, to the present case.

It is impossible not to see that such a relation existed be-tween these parties at the time of the transaction in question —not that there was any suit or litigation actually pending to which the complainant was a party: but there was the general habit of employing and being employed whenever professional services were required and particularly in re-spect to the investment of this very money. This latter bu-siness had not been withdrawn, although the defendant may have ceased to take any pains to accomplish it. When the time should come to put out the money, the complainant would doubtless have relied upon the defendant's profes-sional aid, at least so far as to see that the securities were taken in due form and that the title was good. Nothing had occurred to induce either party to wish for a change of the relation which had existed so long of a regular client on one side and an attorney, solicitor and counsel on the other, nor to diminish the confidence which the former had always reposed in the ability and integrity of the latter. Hence the relation continued and, co-extensive with it, the influence which it is supposed to give.

In order to relieve the defendant from the obligation which this influence or presumption gives rise to, it should be made to appear affirmatively that, before the transaction or dealing took place, the employment had ceased; and that the rela-tion was completely at an end, so that no influence could rationally be supposed any longer to exist: 18 Vesey 127 Such does not appear to have been the case in this in-stance.

It is true, that the defendant's employment in the business of investing the complainant's money on bond and mortgage

did not require of him to judge of the value of the property on which it should be bound or of the solvency or ability of the borrower to pay the interest punctually. I am satisfied, from the testimony, that neither the defendant's habits of business nor any thing which he assumed to do in this particular instance led the complainant to expect that he would take that responsibility. Those were matters which the complainant was to judge of and determine for himself. All that would have been required of the defendant, if the loan had been made to a stranger or third person, would have been to see that the mortgage, taken as security, was founded on a good title ; that the property was free from charge or incumbrance ; and that the necessary papers were prepared in due form and properly executed. And so, if, when he made his application to the complainant for the money on his own account, he had said to him : " I have mortgages of such and such persons on such and such pieces of property, of such and such amounts ; they are founded on good titles and that I can vouch for, but go yourself and examine the property, ascertain its probable value, inquire as to the standing of the bondsmen and, if you shall be satisfied that the securities are ample and sufficient, then let me have the money for them"—in such a case, he would have stood free in the matter. But this he did not do. Instead of putting the complainant on inquiry as to those particulars and leaving him to form his own judgment of the sufficiency of the securities, he, in the haste and precipitancy of the moment, assumed to judge for him ; and gave no time or opportunity for any other determination. The fact of his representing the mortgages as " very excellent" and asking for the money at the instant of sending the papers with assignments already executed, were calculated to inspire confidence and to disarm the complainant of all that prudence, foresight and caution which he would naturally enough have used, had he been dealing in the matter with a stranger : especially when it was not proposed to furnish them with any collateral guaranty for the ultimate payment of the mortgages. Under these circumstances, it seems to me not unreasonable to say that the defendant has assumed, perhaps unconsciously, a responsibility beyond what would have rested·

upon him had he merely attended to the putting out of the money to a third person as a matter of professional business —a responsibility growing out of the confidential relationship in which the parties stood towards each other and the peculiar manner in which the transaction was brought about and consummated—not that there was fraud or bad faith in it—not that the defendant supposed, at the time, that any of the mortgages were other than "excellent securities" when he thus spoke of them—but because, if they were not so, there would be a breach of confidence which it is as much the policy of the law and the duty of the court to guard against and to remedy in behalf of the client as it is to guard against and redress a fraud.

Having shown that the law placed the defendant in a situation of responsibility towards the complainant (his client) commensurate with the confidence that the latter reposed in him, the next inquiry is : whether the McVickar bond and mortgage afforded an adequate security for the principal and interest which it purported to secure ? This inquiry must be made with reference to the time of the assignment and to the subsequent period down to the month of May one thousand eight hundred and forty-two, when the bill in the cause was filed.

I assume, for the circumstances of the case require I should, that the complainant was entitled to securities which would be ample for the ultimate payment of principal and interest and such, moreover, as the interest was regularly paid upon and would continue to be paid upon as it should accrue ; and such, doubtless, the defendant intended to give him when he assigned the several bonds and mortgages. The bond and mortgage in question, however, were not of that character. The interest had not, in fact, been paid upon the bond for some time previously, although a memorandum had been made upon it by the defendant showing that the interest was paid up to the thirtieth day of June one thousand eight hundred and thirty-eight. That endorsement was founded in mistake, as the testimony shows ; and was not made designedly to mislead. It also appears that the mortgagor had become embarrassed ; and had, as early as December one thousand eight hundred and thirty-seven,

1844.

LEWIS
v.
J. A.

executed a bill of sale of his personal property in payment of or as security for a simple contract indebtedness he was under and that, in November one thousand eight hundred and thirty-eight, had ceased to meet his other engagements as they became due. So far, therefore, as the security was to depend upon the individual and personal responsibility of the mortgagor and only obligor in the bond, even for the regular and punctual payment of the interest, it had already proved a failure. But the mortgaged lots were in the hands of subsequent grantees; and they were expected to pay the interest. This expectation was realized until the first of April one thousand eight hundred and forty, when that also failed—the purchasers or those holding the legal title, deeming the lots, at that time, of insufficient value, refused to make any further payment of interest, preferring rather to abandon them. In this fact, we have some evidence of an inadequacy of security in the mortgage as well as in the bond. There is further evidence on that point. The testimony of a number of witnesses, experienced in the business of selling lots and acquainted with their market value during the period from one thousand eight hundred and thirty-eight to one thousand eight hundred and forty-two inclusive, prove that the lots in question would not have brought the amount of the mortgage debt at any time within that period, while other witnesses estimate the lots to be intrinsically worth the amount of the mortgage. But the question is, not what the lots are worth in the opinion of witnesses, but what would they bring at auction on a forced sale? for this must be the criterion of value when the adequacy of a mortgage security is involved. That the mortgage in question was not, when assigned or at any time since "an excellent mortgage" is quite manifest. To be excellent, it should be remarkable for good properties—such as having an accompanying bond of a solvent obligor who is punctual in paying his interest and covering property at all times of sufficient value to produce the amount of the debt, if sold. This mortgage was considerably short of that standard. In the year one thousand eight hundred and thirty-six, when the mortgage was taken, it was undoubtedly good, according to the then estimated value of the lots. The tes-

timony shows that the defendant loaned the amount for which it was given, in cash, and deemed it a perfectly safe investment; and there is no reason to suppose that he knew it to be otherwise in the year one thousand eight hundred and thirty-eight. But, at this time, the lots had greatly depreciated, as was the case every where with real estate. Added to this was the intermediate insolvency of the mortgagor. These facts, the defendant did not stop to consider. He acted hastily in inducing the complainant to take the bond and mortgage for its full amount; and though innocent of any intentional wrong, he has gained an advantage solely from the confidence that was reposed in him—which the policy of the law forbids he should retain.

The existence of an assessment and of an unpaid tax upon the lots at the time the mortgage was assigned, must not be lost sight of as furnishing an additional ground of relief. The complainant never agreed to take the mortgage with charges upon the property which took precedence of the mortgage debt so long as they remained unpaid; and the defendant was bound, by his professional engagement, to inform him of those charges before calling on him to part with his money or else to indemnify him for the loss. This might be a ground for claiming an indemnity merely; and not for rescinding the contract of assignment.

It has been contended, that the other and principal ground of relief does not require that the transaction should be rescinded, only that the defendant should be held liable as surety to indemnify and make good any loss after the remedy upon the bond and mortgage has been exhausted; and hence, that the bill was prematurely filed. I am satisfied, however, that the principal ground is one for annulling the contract, so far as concerns the McVickar bond and mortgage. Again: It is argued for the defendant that the delay in offering to return the bond and mortgage amounts to a waiver of the complainant's right to return them—that, having repeatedly received the interest from those persons whose business it was to pay it, he has acquiesced in the title by the assignment and is now too late in seeking to reject it. With regard to the delay, it can avail the defendant nothing: unless he could show that it has been prejudicial

to him—which can hardly be pretended. The bond and mortgage were offered to be returned as soon as the complainant failed to obtain payment of the interest; and there was no acquiescence in the title by which he held them after he discovered the true condition of things and how he had been misled with respect to the goodness and sufficiency of the securities.

I can perceive no good reason, therefore, for relieving the defendant from his liability to take back the bond and mortgage and to restore the money, with the interest from the time the latter has remained unpaid, namely, from the first day of April one thousand eight hundred and forty—and to reimburse to the complainant the amount he has paid for taxes and assessments; and this to be done on the complainant's reassigning to him the bond and mortgage.

Decree accordingly, with costs.